## NESBITT v. HUDSON et al.　(No. 8483.)

(Court of Civil Appeals of Texas. Dallas. April 30, 1921.)

**1. Exchange of property ⬤=8(3)—Allegations held to plead conspiracy to defraud.**

In an action for liquidated damages, because of defendant's refusal to consummate a land exchange transaction, defendant's allegations *held* sufficient to sustain proof that the contract was obtained pursuant to a conspiracy between plaintiff and brokers to defraud defendant.

**2. Set-off and counterclaim ⬤=41—Cross-action for fraud and conspiracy of plaintiff and others inducing execution of contract proper in action for liquidated damages for nonperformance.**

Under Vernon's Sayles' Ann. Civ. St. 1914, arts. 1329, 1330, defendant's cross-action against plaintiff and brokers, who had represented plaintiff and defendant in execution of land exchange contract to recover damages for fraud and conspiracy inducing defendant to enter into such contract, *held* proper in plaintiff's action for liquidated damages for defendant's refusal to perform the contract, since the counterclaim, though based upon a tort, was connected with and arose out of the same transaction as plaintiff's cause of action, and since the only liability arising out of the transaction in the event of such fraud was that of plaintiff and the brokers.

**3. Exchange of property ⬤=8(4)—Evidence insufficient to prove fraud inducing execution of land exchange contract.**

In action for liquidated damages for nonperformance of a land exchange contract, in which defendant brought cross-action, alleging that plaintiff and brokers induced execution of contract pursuant to a conspiracy to defraud him, evidence *held* insufficient to prove such fraud and conspiracy.

**4. Damages ⬤=85—Actual delivery to payee of note deposited in escrow as liquidated damages held not a prerequisite to suit thereon.**

Where each of the parties to a contract deposited a note payable to the other in escrow, with the understanding that the maker should become liable thereon on his failure to perform the contract, the actual delivery of the note to the payee was not a prerequisite to the payee's right to sue thereon on maker's refusal to perform the contract, the suit being based upon the entire contract comprehended in the note and in their agreement, so that the parties stood in the same relation to the note and contract as would have existed with reference to a sum of money representing liquidated damages and a contract of forfeiture left in the hands of a stakeholder.

---

⬤=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**5. Bills and notes ⬤⟹36—Lack of maturity date held not to have affected validity.**

That note for amount to be paid as liquidated damages on maker's breach of contract bore no maturity date did not affect its validity, the date of maturity in such case being the date on which maker repudiated the contract, which date was to be ascertained by the evidence.

**6. Bills and notes ⬤⟹36—Note without maturity date presumed due upon demand.**

A note bearing no maturity date is valid, and is presumed to be due upon demand unless circumstances are connected with it upon which its maturity is contingent.

**7. Appeal and error ⬤⟹880(1)—Issue between plaintiff appellant's coparty and defendant not considered.**

On appeal by plaintiff from judgment for defendant, in an action in which judgment was rendered for plaintiff and others joined with him, in defendant's cross-action against them, the appellate court will not consider matters affecting merely issues between plaintiff's coparties on the one hand and defendant on the other.

**8. Appeal and error ⬤⟹878(1)—Judgment in cross-action not considered where appeal was only from judgment in original suit.**

On appeal from judgment for defendant in original suit, where there was no appeal from the judgment rendered against defendant in his cross-action against plaintiff and others, the appellate court will not reverse the judgment in such cross-action.

Appeal from District Court, Limestone County; A. M. Blackmon, Judge.

Action by G. M. Nesbitt against J. Hudson, in which defendant brought a cross-action against plaintiff and others. Judgment for defendant in the original action and for plaintiff and others in the cross-action, and plaintiff appeals. Judgment for defendant, against plaintiff, in the original action reversed, and cause remanded.

S. J. T. Smith, of Waco, for appellant.
J. A. Tucker, of Thornton, and C. S. Bradley, of Groesbeck, for appellees.

HAMILTON, J. On a former day of this term the court delivered its opinion reversing the judgment of the trial court and remanding this cause; and we directed the entry of judgment to that effect. Upon further consideration of the case we now find it desirable to withdraw the previously delivered opinion and substitute for it the opinion expressed below. We maintain the same conclusion formerly arrived at, and leave the judgment heretofore rendered undisturbed.

Appellant sued appellee upon a promissory note executed and deposited with a written contract between appellant and appellee in the First National Bank of Thornton, Tex., as stakeholder. The contract embodied the terms of an agreement between the parties whereby appellant was to exchange a house and four lots in Waco for a farm in Limestone county, together with certain live stock and implements owned by appellee. The contract, deposited in escrow at the bank, with the note of each of the parties, contained the following clause:

"Each party, as an evidence of good faith in carrying out the terms of this contract, herewith makes and delivers with this contract his said promissory note in the sum of $1,000, payable to the other party respectively, pledged as liquidated damages for failure by either party to comply with this contract, to be held in escrow deposited in the First National Bank, of Thornton, Tex., until said deal is completed. Said notes to be null and void if said titles cannot be made acceptable to the respective parties hereto."

The original petition, the answer filed by appellee, and the supplemental petition filed by appellant in answer thereto put in issue the whole transaction, and are such, we think, in effect, as to make the suit one for agreed liquidated damages claimed by virtue of the alleged breach of the executory contract for the exchange of the respective properties, the contract and note evidencing the amount of damages to be due upon the breach of the contract being competently shown.

The facts stated below appear to have been established by the evidence. Appellee listed his land for sale or exchange with A. P. Smyth, a real estate agent in Thornton, Limestone county. Appellant had his property in the hands of T. H. Vinson, real estate agent in Waco, for sale or exchange. In the transaction involved in this suit, it seems that Smyth and Vinson were in partnership, an agreement existing between them to divide equally the total commissions to be received from the two parties, a fact then unknown to appellee. A few days before the note and contract were executed, Smyth and appellee Hudson and appellee's son-in-law went to Waco to look at other property for which appellee contemplated exchanging his farm. Appellee and his son-in-law on this occasion were induced by Smyth to inspect appellant's property. Shortly thereafter appellant went to Limestone county, accompanied by Vinson, to look at appellee's farm. He went over the farm and after he had inspected it he and appellee agreed upon the terms of the trade. They then went to Thornton and executed a written contract, mutually binding themselves to execute warranty deeds to each other conveying the respective properties; also agreeing that possession should be delivered "as soon as the respective titles are acceptable and proper deeds of conveyance delivered to each;" providing in the agree-

ment for abstracts to be supplied by each to the other; and further agreeing that each should receive the 1918 rents from the property to be conveyed to him, appellee to receive the rents from the Waco property after April 15, 1918. To secure performance of the agreement thus stated, the penalty clause above copied was inserted, and the note executed.

Appellee repudiated the contract, and refused to do any of the things stipulated in the written agreement. At the time of the repudiation he gave no reason for it. The only reason assigned for it by him in his testimony is contained in the following excerpt:

"We were to close up the deal as soon as the papers could be gotten up, but no specified time. We were to get up our papers as soon as we could. I came up to Groesbeck a day or two afterwards to see about getting up an abstract. Smyth, my wife, my son-in-law Bascom, and I came up together, and I arranged for an abstract. When I went home the night after the contract was signed, my wife was dissatisfied with the way the horses were put in the trade. Smyth had said it was best for them to be put in that way, in the way the land was put in, and on the way up to Groesbeck she got after Smyth about that, and he said if she was dissatisfied with the way the horses went in, he could get her out for $150, that there was a gap left open, and my wife said, 'Yes.' He said the date in the note had been left blank, the maturity date of the note. Up to that time I did not know that Smyth and Vinson were jointly interested in the transfer of the property. Right then I commenced to mistrust him, and you would too. If there had not been something wrong he would not have said he would get me out for $150. My wife then said when she got to Groesbeck she would go and see Kit Bradley, and he said, 'If you have to have Kit Bradley bobbing up in it, I am not going to have anything to do with it.' I never did tell Mr. Nesbitt I would not carry out the terms of the contract. We got Judge Tucker to write him afterwards. The letter introduced here by the plaintiff is the letter I had Mr. Tucker to write. That was the first time, and I never did carry out the contract. My reason for not carrying it out was we found there was something wrong."

He further testified as follows:

"I first told him (Smyth) I would make the trade after we had got to Thornton. I had seen the house at that time, and had gone through a part of it, but had not noticed it because I had no dream of trading for it. After I came back home, I made up my mind to take it, if they would treat me right. After I had made this note and contract, if everything had been straight I would have consummated the deal at that particular time. I had good faith in him at the time, and intended to go ahead and have my abstract made and deeds signed, and close up that trade, if everything went straight on. With reference to whether or not I knew when I signed that contract, I was bound by it, and that, being 65 years of age, I had transacted business long enough to know, I will say, if the

contract had come up straight. As far as I know, everything had been straight about the contract until this conversation between Mr. Smyth and my wife took place as we were coming to Groesbeck two or three days later to have the abstract prepared. No, sir; everything was not straight at that time, so far as I knew. My wife did not want to have it made. After we got back home that night my wife said that the horses could be taken off the farm and we could not get one cent for them; that there was not a thing binding on these horses. Yes, sir; my wife was dissatisfied with the trade, and before it was made. It was discussed there in her presence, but they did not do as she had told them to do. Yes, sir; it was satisfactory to me if they had come straight, and it would have been satisfactory to me to close the trade as it was written, if they had come clean. She told Mr. Smyth she was not pleased with it, and he said that he had left a gap down and could get us out for $150. With reference to whether or not the only crooked thing I knew of up to that date which had been perpetrated on me was that of the maturity date in the note having been left blank, and his promise to get me out for $150, that is what he said. There was another thing that indicated to my mind that he had been unfaithful, and that was with reference to the horses. He did not have them secured, and he said, 'I did not intend that,' and I told him I was trusting to him. It was Nesbitt and Vinson who made the trade with me for the horses. No, sir; it is not a fact that Mr. Nesbitt and I were down at the barn, and the two real estate men were at the house at the time we agreed upon those terms. Mr. Smyth was not there, but Vinson and Nesbitt were, and I said to Vinson right then that I should have pay for my horses, and he said that Smyth had put my horses in. Yes, the horses were mentioned in the contract, but there was nothing said that would keep them from being taken off. I don't know whether or not there would have been a lien against them, secured by that year's crop, if the trade had been made; I left it to Smyth, and I had no dream that he was going to gouge me or underrate me."

Hudson's wife testified as follows:

"I remember the time when Mr. Smyth and some other gentlemen came down to our farm to look at it. I was at home several days when they came. They may have come once when I was not there. I remember the circumstance of Mr. Hudson's returning to Thornton with them, and I afterwards learned he had signed a contract. I was at home that day. Mr. Smyth, Mr. Vinson, and Mr. Nesbitt came down there together. I talked to them that day. I tried to talk to all of them. I did not want it done, and tried to talk with all of them. I talked to Mr. Nesbitt, and was objecting to all of the transaction; I did not want it done. I told Mr. Nesbitt if they would pay me $2,000 cash, I would sign it. Mr. Nesbitt never did promise it. He said he would pay all he got out of the Loan Association. Of course, I did not want it to go on promises. As soon as Mr. Hudson came home I found the contract had been signed. He brought a copy of it home with him, and read it to me; I did not go up to Thornton with him. After the contract was

signed, we came to Groesbeck. It was just a few days afterwards; we wanted to have the abstract made. Mr. Smyth, my son-in-law Bascom, Mr. Hudson, and I came together. I don't know why Mr. Smyth came. On the way, I told Mr. Smyth that this stock should not have been put in on the trade, and he said just wait, and Bascom stopped the car, and he then said he had a gap down and asked us if we would give him $150 to get us out of this scrape, and I told him yes. I also said that when I got to Groesbeck I was going to see Mr. Bradley, and he said if I had Mr. Bradley, or any other lawyer, he would have nothing to do with it. I never saw Mr. Bradley on that day, and we went on the way. I lost confidence in Mr. Smyth when he told us this. He said this 'gap' in the contract was the maturity date in the note having been left blank. I have been knowing Mr. Smyth's face about 19 years; as long as we were living around Thornton. Yes, sir; before he made this proposition to get us out for $150 I had confidence in him. Of course I had commenced to doubt him, and when he said that I thought there must be something wrong. It was after that, I think, when he went to Waco to look at the property I went along with the rest of them, and think it was after this conversation that we went."

Appellant tendered appellee his deed and abstract, and offered fully to perform the contract.

Appellee pleaded as independent defenses a general demurrer and general denial; and specially that the note was put in escrow in the bank, and was not to be delivered to appellant until defendant directed its delivery; that he never directed its delivery, and that it had never been delivered. He also pleaded failure of consideration, arising from fraud and conspiracy, and set up a cross-action against appellant, Vinson, and Smyth for damages consisting of attorney's fees and other expenses incurred in connection with the suit, alleging that they formed a conspiracy to defraud him out of the property which he was to convey, and that the conspiracy and fraud practiced upon him resulted in his executing the contract and note. It was alleged that Smyth and Vinson had already filed their suit against both appellant and appellee in the district court of McLennan county to recover broker's commissions against them; that they sued as partners, and were partners at the time the trade was made, and concealed that fact from appellee; that the same attorney who represented Smyth and Vinson in their aforesaid suit filed an answer therein for appellant; and, that he was the attorney of record for appellant in the instant case. It was also alleged that Smyth misrepresented to appellee the value of the Waco property, exaggerating it, although appellee was relying upon his representations as to such value, he himself knowing nothing about property values in Waco. What knowledge of such values Smyth had was not alleged.

The case was tried before the court and a jury, and resulted in a verdict and judgment in appellee's favor upon appellant's suit, and in appellant's and Smyth's and Nesbitt's favor upon the cross-action.

[1] Appellant excepted to the allegations of fraud and conspiracy as being general and indefinite, and stating conclusions. The pleadings do seem to be replete with legal conclusions, rather than allegations of facts, clearly stating a conspiracy and fraudulent acts against appellant. The allegations that Smyth deceived appellee as to the value of the Waco property, that in so doing he acted with appellant, and that the same attorney who represented him in the suit for commissions against appellant and appellee filed an answer therein for appellant, and was also representing appellant in the instant case, are the only allegations in relation to fraud and conspiracy as affecting appellant which seem to state any definite facts to be proved. However, we regard the allegations, as a whole, adequate to sustain proof of a conspiracy and fraudulent conduct against appellant. We are therefore of the opinion that the court did not err in overruling appellant's exception to the cross-action, complaining that the allegations of conspiracy and fraud were too general and indefinite, and were mere conclusions.

[2] Appellant excepted to the cross-action upon the ground that it presented a misjoinder of parties and a misjoinder of causes of action, and assigns as error the action of the trial court in refusing to sustain the exception. If facts had been proved by legal evidence revealing the transaction upon which appellant based his right of recovery to have been the result of deceit and fraud practiced by appellant in carrying out a conspiracy against appellee, and that he had sustained damages as a result of it, then appellee would be entitled to have his damages against appellant and the other two upon the cross-action in this particular suit, notwithstanding that plaintiff's suit was upon a demand for fixed damages in the nature of an agreed penalty, and the counterclaim was based upon plaintiff's tort. Articles 1329 and 1330, Sayles' Rev. Civ. Stats.; McDonald v. Lastinger, 214 S. W. 832; Tyson v. Jackson Bros., 41 Tex. Civ. App. 128, 90 S. W. 930. This is so because the counterclaim not only is connected with, and arises out of, the same transaction, but also, if established, shows that the only liability resulting from the transaction was against appellant and his joint tort-feasors in appellee's favor. The elements of such allegations are both a basis of complete defense and of affirmative relief. However, we think appellee was entitled to no such recovery in this case against appellant under the proof, because of its insufficiency.

[3] While, as above stated, the cross-action sufficiently alleges a cause of action against appellant, we could not have permit-

ted a recovery against him to stand in the light of appellee's testimony above quoted, and of the further proof that, before the contract was made, appellee, with his son-in-law, went to Waco and inspected appellant's property, and thus had the entire subject-matter before him when he traded. At the time he inspected the Waco property he formed and expressed a judgment to the effect that it was too high. There is no proof that Smyth was acquainted with values in Waco, and no proof of any fact tending to show that appellant and Smyth conspired to induce appellee to believe that Smyth was acquainted with such values. We think the evidence as a whole not only fails to show any right of affirmative relief against appellant, but is also inadequate to sustain the defenses pleaded by appellee, and we sustain appellant's complaint to that effect.

[4] Appellee advances the proposition that the judgment ought to be upheld because the note was never delivered, as shown by the proof, and therefore was void, and never became binding as an obligation. We believe the case can be said to present clearly only one principal question, and that is whether or not appellant is entitled to recover a stipulated amount as damages for the non-performance of an executory contract alleged to have been deliberately breached by appellee. The suit is based upon the entire contract comprehended in the note and written agreement, both of which are to be looked to in determining the controversy. The two instruments, considered together, reflect the mutual intention to have been that either party to the trade who refused to perform it should thereby become liable to the other in the sum stipulated in the note. Under such circumstances, the parties stood in the same relation to the note and contract as would have existed with reference to a sum of money and a contract of forfeiture left in the hands of a stakeholder. Actual delivery of the note by the bank into appellant's possession was not a necessary prerequisite to his right to sue upon it. The only prerequisite to such right after the contract and note were signed and delivered to the bank was appellee's refusing to perform.

[5, 6] The note signed by appellee and deposited in the bank with the contract bore no maturity date, but the date of payment was left blank. Appellee contends that a suit upon the note cannot be maintained for this reason. We think the proposition is unsound. Such note is valid, and is presumed to be due upon demand unless circumstances are connected with it, as here, upon which its maturity is contingent. The maturity date, in this instance would be the date when appellee repudiated the contract, and that date is to be ascertained and fixed by the evidence. Glass v. Adoue, 39 Tex. Civ. App. 21, 86 S. W. 798; 8 C. J. 405.

Appellee's propositions relating to the agreement between the two land agents to share equally in the total commissions to be paid seem to us, under the evidence, unavailing as against this appellant. Their force would doubtless be manifest in resisting a suit by the agents to collect commissions, but to this appeal we do not think they have effectual application against appellant under the record.

[7] The appeal having been prosecuted only by Nesbitt, and the judgment below being favorable to Vinson and Smyth, we will not discuss certain assignments of error which are presented by appellant, but which disclose matters seeming to affect only issues which existed between Vinson and Smyth, on the one hand, and appellee on the other.

[8] There being no appeal from the judgment upon the cross-action, and it being separable from and independent of the judgment upon the original suit, we do not disturb it. But, for the reasons above indicated, we reverse the judgment as between appellant and appellee upon appellant's alleged cause of action, and remand the cause for further proceedings.